After you gentlemen get settled, the next case of the morning is 2460040, Intuit v. FTC May I please the court, Daniel Valchok for The FTC concluded here that it was deceptive for Intuit to tell consumers that its free edition product is free, even though it's undisputed that free edition is and was 100% free for every person eligible to use it. No one has ever paid a penny to use free edition, it is literally impossible to pay to use it, and tens of millions of people, not remotely some de minimis number, tens of millions have used it to file their taxes for free. The FTC then used its deception ruling to install itself as overseer or micromanager of Intuit's advertising for 20 years, though without making itself accountable in any way to Intuit's shareholders, employees, or customers. And all of this flowed from a complete breakdown in the agency process. That breakdown included the FTC chair, Lena Khan, making multiple public statements while serving as an adjudicator in this case, statements that created at a minimum an appearance of bias. The breakdown also included the agency retreating to its own courts, where it has basically never lost in 30 years, and where it can act as the judge of its own allegations, retreating to those courts only after it first went to a neutral Article III arbiter and was rebuffed. None of this is lawful, this court should set aside the commission's decision and its cease and desist order, and direct the commission to dismiss its claim against Intuit. Starting with our Article III challenge, the Supreme Court's decision in Jarkissi makes clear that the FTC denied Intuit an Article III forum here. Jarkissi reaffirms that Article III prohibits Congress from taking away from the courts any matter which by its nature is the subject of a suit in equity. And that includes this case, the FTC does not argue otherwise. The FTC instead relies on the exception to the rule I just stated, an exception that allows certain public rights to be adjudicated outside Article III courts. But Jarkissi emphasized that the public rights exception is narrow because it is wholly atextual. And that narrow exception does not apply here because there is no history of deceptive advertising cases, fraud cases, etc. being adjudicated exclusively, and that is Jarkissi's word, exclusively outside the courts. Now the four arguments that the FTC offers about our Article III argument are all foreclosed by Jarkissi itself. First, the FTC points to various differences between claims under the FTC Act and claims for deceptive advertising, etc. at common law and in equity. But similar differences existed in Jarkissi between statutory securities fraud claims and common law claims. And the Supreme Court said those differences did not allow the statutory claims to be brought outside the Article III courts. Excuse me, yes, to be brought in agency courts. What mattered, Jarkissi said, was that the statutory claims and the common law claims, quote, targeted the same basic conduct, misrepresenting or concealing material facts. Precisely the same is true here. And when I say that, I don't just mean it is also true here that the claims under the FTC Act and the common law or equitable claims target the same basic conduct, although that is true. I mean the same basic conduct that Jarkissi identified as common in that case is the conduct here. Again, misrepresenting or concealing material facts. So Jarkissi is on all fours with this case, or all fives if there were such a thing. The FTC's second argument is that its adjudications are constitutional because it's been doing them for over a century. Footnote 2 of the Supreme Court's opinion in Jarkissi, the very end of that footnote, rejects that same argument. The court said a failure of one generation to bring certain challenges cannot waive the rights of a later generation. And it's unclear, the court said, how a lack of challenges could transmute, and that's Jarkissi's word, a private right into a public right. Third, the FTC says that accepting our argument would largely dismantle the FTC Act's scheme. Again, Jarkissi rejects that. It says practical considerations have never been deemed sufficient to justify expanding the public rights exception. And even putting Jarkissi aside, Your Honor, it is not, Your Honors, it is not a response to a constitutional violation to say Congress has authorized us to do this. That is a non-starter. Moreover, the FTC is exaggerating the consequences of accepting our argument. Deceptive advertising and similar claims are adjudicated in the courts all the time, including by the FTC. The FTC frequently brings cases in court. Again, it initially did so here. So there is no sense in which accepting our argument would largely dismantle the FTC Act's scheme. They only, FTC, what, had one ALJ until recently? Yeah, I believe that is correct, Your Honor, and that, of course, isn't. So they did their work for 100 years with one ALJ? Well, I wouldn't represent to the court that it has been one ALJ for the entirety of that time, Your Honor. But I certainly take the point, and I think it underscores our Jarkissi argument and some of our other constitutional arguments. But I would like to just make sure I have a chance to finish the FTC's arguments about our Article III claim, their fourth argument. Or really, they rely on older Supreme Court cases. Now, none of those cases, most of them don't even use the phrase Article III or the word constitution, and not one of them held FTC adjudications constitutional and rejected our Article III argument. And to the extent any of those older cases, their reasoning differs from that of Jarkissi. It is, of course, Jarkissi that controls. Next, Your Honor, I want to talk about the FTC's deception ruling and the evidence supporting it or lack of evidence supporting it. My submission is that the record as a whole does not support the FTC's deception ruling in light of five considerations. And I'll just name them quickly and then circle back and talk about each in more detail. But the record as a whole does not support the deception ruling considering, one, the disclosures in the challenged ads, two, what reasonable consumers know or are presumed to know, three, relevant metrics like complaint rates, complaints about intuits advertising, four, the thoroughly implausible theory of deception that underlay the FTC's decision, and fifth, the lack of probative value of the key evidence that the FTC relied on, namely copy tests and Professor Nathan Novemsky's survey. Okay, so those five considerations, let me talk about each. But stepping back first for a moment, the question is whether the challenged ads conveyed a message that was likely to deceive a substantial minority of reasonable consumers. The FTC said the ads did that because they told consumers that, quote, unquote, you could file for free. Or sometimes the FTC phrases it as they could file for free, users could file for free, consumers could file for free. All of those variations are essentially the same. Essentially what the FTC is saying is the deceptive message was that Intuit was telling people everybody could file for free. No, they refined that to the door opener, right? That is part of their analysis, Your Honors. But I submit that is the deceptive message. I submit it doesn't matter even if it is the phrasings that I used a moment ago, you could file for free, they could file for free, consumers or users. It doesn't matter. None of those messages could have been taken away from the challenged ads by a reasonable consumer. Judge Breyer recognized that immediately, saying nobody thinks the ad that everybody can file for free and the ads don't. I read the FTC's decision last night and it has counter arguments to what you just said. What I understand to ultimately retreat to Judge Jones, and I think you see it most clearly in footnote 26 of their decision, they say even if consumers didn't take away the message that everybody could file for free, that doesn't necessarily mean they understood whether they could file for free. That has never been the deception standard. It could not realistically be the deception standard. I thought they had gone after free advertising in the past. I thought there were cases about that. So there are certainly cases in which there have been deception rulings in connection with advertisements that in some way or other advertised a product for free. But in those cases, it was a circumstance where, for example, in the Supreme Court case that they cite from I think the 1940s, a company advertised two-for-one cans of paint, but was selling the one can for essentially what two cans normally sell for. So it was really not offering something for free. Those are the circumstances. I don't have a standard business practice. I hesitate to speak about standard business practice. As a frequent consumer. But it does go to the point that what Intuit was doing here was entirely commonplace in the market, right? The FTC seems to profess shock and surprise that Intuit was attempting to get customers' attention with its ads. This is what businesses do. They try to get consumers interested in trying out their products and try to cut through the information glut that overwhelms consumers. There's nothing unusual about this. There's certainly nothing nefarious about this. And, of course, when you do that, you have to be sure you are giving consumers the full story so you're not leaving them deceived in any way. And the first reason that reasonable consumers here could not have been deceived by the challenged ads, as I mentioned, was the disclosures in those ads. Every challenged ad had some form of disclosure. Normally, it was for simple returns only. See if you qualify at TurboTax.com. There was some variation across the 200-plus ads that the FTC has seen fit to lump together for purposes of its decision, even though they ran over different years and in different modes, television, e-mail, et cetera. But every ad had disclosures, and those disclosures alone preclude the message that the FTC is identifying. Again, whether it's you can file for free, they can necessarily file for free, what have you. A reasonable consumer seeing, hearing, or reading the ads with those disclosures would not jump to the conclusion that they could necessarily file for free. Now, also mentioned, what reasonable consumer? Novemsky never got to that precise distinction, did he? That is true, Your Honors. He did not show his survey participants a single Intuit challenged ad or the website, even though he was purporting to opine on the effect that Intuit's ads had on consumers. There's simply no way to draw reasonable conclusions from such a survey, particularly when he is also not using a test and control group, despite himself having previously testified in a different case that you can't draw conclusions about causation without a test and control group. And, of course, there were myriad other flaws with his survey. He told consumers near the end of the survey, he told participants near the end of the survey, it was essentially an anti-Intuit survey. He said, this is for the FTC. The FTC is the nation's consumer protectors or protector of the nation's consumers. We're investigating deceptive practices. This is about Intuit. You can help us. Would you like to opt out? One-fifth of the people thereupon opted out. Their results are not included in his survey results, and it is entirely reasonable to believe that those people were the ones who were not as interested in participating in an anti-Intuit survey. So no weight whatsoever can be given to Nathan Novemsky's survey. And the same is true of the other key piece of evidence that the commission relies on, namely the copy testing. This was copy testing that Intuit did of its own ads. And what the commission says, take, for example, the tax year 2020 copy test. They point to that and they say, they tell this court, up to 57% of people, after seeing an Intuit ad, believe that they could file for free when the commission says it's actually in the 30s for the full U.S. population. But let's get our facts straight. In that copy test, there were four ads shown, each to a different group of about 200 people. So four groups, four ads. The number of people who said after seeing those ads that they thought they could file for free, one of them was 57%. The other three were in the 40s. So much closer to the 33%, but it doesn't even matter, Your Honors. Here's the key point. The ads that were shown in the 2020 copy test were not the ads that were actually aired. And in particular, they didn't include all of the disclosures. So they do not provide any probative evidence of what the actual ads, what the effect of the actual ads was on consumers. I talked about metrics, and I do want to make sure I get to that, because the metrics here, complaint rates, customer satisfaction rates, customer retention rates, are vastly different than any that the commission has previously deemed sufficient to warrant a deception ruling. We're talking about, at most, 228 complaints. It's actually far fewer, but I'll give that number to the commission. They said there were 3,851. And I will give them that number, too. So just to be clear, the 228 was the number reported, according to the commission, to them, to the FTC. The 3,800 negative reviews, according to them, was what was received by Intuit. But we're talking about a company that has tens of millions of customers and ads that ran billions of times. So you have to put a lot of zeros in front of the one before you even get to the percentage. And the commission uses this information as evidence not just of deception, but of willful deception, as though it was somehow unusual that Intuit, seeing numbers like this, of course, didn't have full access to all the numbers, but certainly the complaints, et cetera, that it received. The notion that Intuit did anything wrong by not changing course when well over 99 percent of people evidently were fully satisfied is just ridiculous. And the only other thing that the FTC says about the complaint rates, they say that complaints can be evidence of deception, but the lack of complaints is not evidence of no deception. Okay, that heads-I-win, tails-you-lose, Alice in Wonderland reasoning exemplifies, in a nutshell, the FTC's starkly unfair playing field and its outcome-driven decision-making. What they are saying is the evidence can only ever point in one direction toward deception, and that is absurd. The law has never been that. The last point of my time is expired, Your Honors, unless the Court has questions. I'll save the balance for rebuttal. Thank you, Your Honors. All right. Thank you, sir. Mr. Grossman. Good morning, Your Honors. May it please the Court. Brad Grossman for the FTC. This is a straightforward deceptive advertising case similar to those that the Commission has adjudicated and courts have upheld for over 100 years. Intuit told consumers over and over that filing on TurboTax was free and you can file on TurboTax for absolutely nothing, a statement that was undisputedly false for two-thirds of consumers. How many millions of people use TurboTax? I'm not exactly sure how many, but- Fifty-five million? Yes, but that was a claim that's literally false for two-thirds of that 55 million. But it's true for, you know, 18 million. There's a fundamental principle of advertising law that when an advertiser makes an affirmative statement that could be false for some segment of the population, it needs to provide disclosures that are prominent and unambiguous so as to dispel a likelihood of misimpression. These principles were established decades ago and are encapsulated in our 1983 deception statement issued during the Reagan administration. This case is a straightforward application of those principles. The Commission found, based on substantial evidence, including business records, testimony, and complaints, that Intuit's disclosures were too small to notice and too vague to dispel consumers' misimpression that they could file for free. Judge Jones, every ad must rest on its own merits. That's another fundamental principle of advertising law. Intuit cannot seriously dispute that in those Super Bowl commercials, in the free, free, free, free, free commercials, a reasonable consumer could not possibly, or at least many consumers, could not reasonably have been expected to see those disclaimers. Does this make this public rights as opposed to private rights? I just have a problem with this whole theory about, well, somebody could have misunderstood free, but they're never going to have to pay for something that they decide not to pay for. Well, the harm here is pretty clear. When a consumer goes, first of all, tax filing is something that consumers often do at the last minute. If it's April 13th, April 14th, you're putting in your data. I don't have evidence about that in the record. It's in the record. Our expert testified to it that large numbers of consumers, I believe it's over a third, file in the last two weeks of tax season. And what that means is you're filing, if you're like me, you're filing on April 14th. You spent an hour putting in your data. Pardon? And you have a simple return. Oh, my returns are anything but simple. I've got kids. Many people are putting in their data. They might make $20,000 a year, and it slips their mind. They collected unemployment for a week. All of a sudden, they're disqualified. Or I should say, Intuit changed its definition of simple on a yearly basis, so some years they qualified. I looked at that again in the FTC findings, and it looked to me as if what Intuit was doing each year was broadening the scope of simple to include certain other standard things, I think an unemployment compensation being each year it broadened it a little bit, so more people were eligible. In 2020, Intuit added unemployment to the categories, and then in 2021, they took it away. So a user in 2019 would not have been eligible if they had unemployment. In 2020, they would have been eligible. In 2021, they would not have been. Maybe that had to do, I mean, that's rational given COVID, right? Well, the question is not what's a rational business decision. The question is what reasonable consumers would understand. Even if Your Honors believe that simple was something that was perceptible or that some consumers could understand, reasonable consumers couldn't see it. What's the gravamen? Well, number one, are you conceding that these are private rights and not public rights? Because if you lose that issue, you know, we have to vacate the award. We don't concede that whatsoever. Well, that's sort of the threshold issue, isn't it? Absolutely, and the court should reject Intuit's argument on the public rights issue. The Supreme Court has upheld FTC administrative cease and desist orders in numerous cases dating back a century, stating repeatedly that the FTC's cause of action does not sound in the common law. Over and over again, they stated that Congress specifically considered and rejected the notion of tethering the FTC Act to a common law standard. I'd refer this court to Justice White's opinion for the court in Sperry v. Hutchinson in 1972, where the court held that the FTC does not arrogate excessive power to itself when it considers public values in a manner comparable to a court of equity. And in that decision, again, the court said that the FTC Act standard does not adhere to the common law. We ought to trace the common law roots here. The relevant tort in question was a tort of unfair competition. A tort of unfair competition was narrowly constrained to two very narrow types of misrepresentation. Well, now, wait a minute. You know, as of 1938, the FTC's — you wouldn't have this case but for the 1938 amendment. I believe we would — Which went into fraud and deceptive. We would absolutely have had this case before the 1938 amendment. No, because you had to prove unfair competition. So that actually cuts in favor of the FTC Act adjudicating public rights. Well, we have until 1938, but now we're in a jarczy world, post-19 — you know, where FTC goes after fraud and deception. It has no impact on competition, which this didn't. I apologize for talking over Your Honor. That's okay. It's not my intention. The 1938 amendments actually cut in favor of this being a public right because it granted an absolute divorce from the common law. The common law of unfair competition is what some courts had — is what required harm to competition. When Congress amended — Yes, I read it. Maybe I'm just reading the history totally wrong. But I understood that the Supreme Court in a unanimous decision, I think written in the mid-30s before the court turned over, said that unfair competition is a sine qua non, and therefore the FTC cannot do fraud and deception apart from unfair competition. There were decisions — And so Congress in 1938 amended. There were decisions going both ways on that question, actually. Well, the Supreme Court is one way. There were two — there were Supreme Court decisions going both ways. R.F. Keppel and brothers did not require harm to competition, and Rattalam did. And Congress resolved that ambiguity in 1938. I wonder if we're conflating two very different points. One is that the FTC is not strictly bound by preexisting common law and can evolve and change as it sees market conditions require. That's different from this is completely unrooted in the common law. I mean, certainly all of this that we're talking about is rooted in common law principles, even as the commission is not formally bound by it. I think we have to look at what the question is on public rights for Murray's laissez. The question on public rights is whether the action from its nature is one that would sound — that must be brought in a court of law or a court of equity. An action of this sort could not from its nature be brought in a court of equity. And I'd refer this Court to the Sixth Circuit decision from 1900 in American Washboard. That's a decision by three future Supreme Court justices, Taft, Lurton, and Day. And what they said was a court of equity lacked jurisdiction to grant injunctive relief for the purpose of protecting the public. Protecting the public was incidental. To establish jurisdiction in a court of equity in a false advertising case, a plaintiff needed to establish monetary harm to itself. And then the Supreme Court clarified what that meant in a 1927 Justice Holmes case called Mosler Safe. And what that required was the plaintiff, to get jurisdiction in a bill of equity for false advertising, needed to prove that all of the lost sales would have gone to it rather than other market participants. All right. Here's — but here's — I mean, you're just ignoring the Supreme Court in Jersey. Because they said the fact that some of this may overlap with public rights if there's a substantial private right component does not take it out of the ambit of Article III. And I have — I could go with a bunch of sites here, but for the sake of time, I won't. I think — well, first of all, Jerkesy dealt with — Jerkesy did not say it was a definitive accounting of public rights. I agree. It was confined to the Seventh Amendment issue for securities fraud. It did not mention the FTC at all. There's no reference to the FTC, no reference to the unique history of the FTC. No, but it's a big, long discussion of public versus private rights. And, again, Justice Roberts says what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled. The object of this SEC action is to regulate transactions between private individuals interacting in a preexisting market. The government has created claims whose causes of action are modeled on common-law fraud and provide a type of remedy available only in law courts. This is a common-law suit in all but name. I do not see how one could say that this is a common-law suit in all but name when the Supreme Court — there's direct Supreme Court precedent saying that this is not a common-law suit in all but name. If the Supreme Court — I grant there may be uncertainty about the parameters of jarcossy, but to the extent that there is any doubt, the correct answer would not be nullifying dozens of precedent of the Supreme Court saying that substantial evidence is the standard of review in an FTC case. JUSTICE GINSBURG You know, we all agree that Judge Friendly was a very brilliant fellow. And one of the cases I was reading before I came up here was a Second Circuit case from the 80s or 70s. And Judge Friendly was saying that the FTC, albeit in dissent, but he threw out the comment that the FTC law had roots in the common law through the 1938 amendment. So does Judge Friendly wrong? MR. CLEMENT Respectfully, the test cannot be simply whether an action has some coextensiveness with the common law. The common law was a set — JUSTICE GINSBURG I mean, that's emphatically not what jarcossy says. MR. CLEMENT Well, jarcossy also did not overrule a single precedent. It did not overrule Kroll. It did not overrule NLRB v. Jones and Laughlin Steele. It did not overrule CFTC v. Schor. All of these cases run counter to Your Honor's respectfully interpretation of jarcossy. If the Supreme — if anyone is going to overturn Supreme Court precedent, it should be the Supreme Court. MR. CLEMENT So I was going to ask about that, because I don't know if you were here for the previous case, but we have that similar dynamic. I think one difference, though, is in the previous case, you had square precedent called Stinson dealing with the Sentencing Commission. You don't have a square precedent here. MR. CLEMENT We have — we've got — we've got a couple of things. There's Kroll v. Benson, which acknowledged that the FTC was a familiar example involving public rights. There's Schechter-Poultry, the high-water mark for the non-delegation doctrine. MR. CLEMENT None of these deal with the ALJ aspect of the FTC. MR. CLEMENT Pardon? MR. CLEMENT What I'm asking is, is there a case of the Supreme Court dealing with the specific constitutional objections we're talking about here, not sort of, you know, general rhetoric about the greatness of the Commission, specifically dealing with the claim that we're talking about here, the Article III, the removal? That's an open question, isn't it? MR. CLEMENT I don't — I don't believe so, because I think that the question is whether — there are courts — the courts over and over again have said that the FTC's judgment is entitled to deference under a substantial evidence standard of review. Its remedies are reviewed for a reasonable relationship, and that — MR. CLEMENT But all those things can be true in the ALJ structure of the Constitution. MR. CLEMENT Oh, I apologize. MR. CLEMENT Yeah. MR. CLEMENT I apologize. Are we moving on to the ALJ issue now, rather than — MR. CLEMENT I'm just trying to understand the constitutional claims and whether they're foreclosed by Supreme Court precedent. That's what I'm not seeing. MR. CLEMENT I — MR. CLEMENT Maybe I'm misunderstanding your point. I apologize. MR. CLEMENT I just — I think that they are not foreclosed. I think the Supreme Court, again, has held consistently that deference to the FTC's findings of fact and conclusions and remedies are acceptable, and that courts must defer to them. JUSTICE SOTOMAYOR Well, Kroll was not an FTC case. You're referring to Dictum. And in Jharkhasi, Justice Roberts devotes a paragraph to explaining why relations with Indian tribes, public lands, and public benefits are quintessential public rights, which Kroll was. As I — as I — as I stated, though, if the reasoning were — if the reasoning of Jharkhasi were simply limited to those historic categories of adjudication, that would require the Supreme Court to overrule a large number of its own precedent. The Court has not done so. This — the Court affirmed this Court's ruling in Jharkhasi, which did not. JUSTICE GINSBURG But it didn't overrule — you're saying we would be overruling precedent. But if there is no precedent that says that the FTC is adjudicating rights that have to go before an Article III tribunal, which is a structural — one might even say jurisdictional issue as to FTC, then they haven't ruled. If they haven't ruled, they haven't ruled. I would appreciate the opportunity to submit to this Court a line of precedent from the circuit courts in the — in the two decades following the FTC Act's enactment, which upheld the — which rebuffed a very similar Article III challenge to the one at issue here. And in those cases, they relied on a Supreme Court decision called Union Bridge in 1907, which — and I can submit that to the Court. I would really appreciate the opportunity to do so, given the gravity of issues here. And what — here's what happened in Union Bridge. It was a simple cease-and-desist order. The agency — Congress delegated to a Cabinet official the authority to require bridge owners to make modifications to their bridges to prevent obstructions to interstate commerce. And this opinion by Justice Harlan said that that was not — that did not intrude upon Article III or the core aspects of the judicial power, because what the agency was doing in that case, entering a prospective order for interstate commerce, was something that Congress could have done itself, which is a big distinction from jargosy. Congress, in this case, could have imposed every aspect of the cease-and-desist order legislatively. They could have propounded a detailed false advertising code, but they did not do so. And — but they delegated to the Commission the authority to do so. That's — that cannot be the law, because if that were the law, Congress could pass anything about anything and say that it was interstate commerce and, therefore, no Article III. The constraints of the public rights doctrine would still apply insofar as — we certainly concede that Congress cannot move anything involving interstate commerce to an agency involving a truly private right. But I submit to you that what we have here are public rights. The Supreme Court has directly stated, in such cases as American Airlines, that the FTC Act involves public rights. And there's one more case, and I apologize because we didn't have much opportunity to brief this. The Court granted us 1,500 words. There's an FTC Act case called FTC v. Klesner. I believe it was 1929. I'd also like to appreciate the opportunity to submit it to the Court. Klesner said, though the FTC operates as judge and prosecutor, its authority is strictly limited. It's limited because the FTC does not vindicate private rights. That's what the opinion by Justice Brandeis said, because the FTC is not punishing wrongdoing. Its objective is to protect the public, and we lack jurisdiction to even adjudicate a case that is merely a private business dispute. I think it's very important for the Court to consider that, because subsequent courts, appellate courts, the FTC have all relied on these pronouncements from the Supreme Court. This Court, Judge Jones, Judge Ho, Judge Barksdale, has referred to itself as a strict stare decisis court that will not ignore precedent of the Supreme Court unless the Supreme Court instructs it to. But into its argument would require this Court to ignore countless decisions of the Supreme Court and this Court and render them a nullity based upon jerkacy, a decision that does not mention the FTC, does not grapple with the FTC's specific rights and remedies. And I submit that that argument cannot stand. What's the sort of lead case that you would think of, this lead Supreme Court case that we would have to overturn, which would obviously be wrong if we were to grant these claims? I mean, I've gone through what I think they would be. I mean, there's Sperry and Hutchinson, there's North American Airlines, Standard Education, Algoma, Lumber. All of these cases recognize the FTC's authority to adjudicate and recognize that the FTC Act does not have a common law providence. At best, I think it's unclear how the Supreme Court— We're talking about cases that characterize the relationship between the FTC and common law. That's sort of your— I think that's right. But there are additional cases as well. There's a case called Pan Am v. United States. Well, you can file a 28J letter and just list all these cases. I would really appreciate the opportunity to do so because, as I said, we were granted 1,500 words for a supplemental brief. And on an issue that is of this paramount importance, we would definitely appreciate the opportunity. This panel didn't do that. If the court—Judge Jones, we would really appreciate—we would comprehensively brief any question this court has with respect to the public rights doctrine. If the court were considering issuing a ruling on this question against us to, again, render dozens of decisions a nullity, I'd really appreciate the opportunity to answer any question on this court's mind so that we can thoroughly brief these issues. Because, again, they're very important, and we want to make sure that everyone gets to the right answer here. Well, you—why did you—okay. I understand what you're saying. And I would also—you know, if there are other questions that the court has about the merits or— Let me—I do have a question more case-specific and less constitutional. Sure. If I understand your brief and your presentation today, it's—the word simple U.S. returns is too fleeting. It's only a few seconds. It's smaller text.  All those sorts of things. How would you compare that to, you know, all these ubiquitous radio commercials that you hear where the words are spoken super quickly at the very end? Well, the— Typically required by a government agency. Intuit actually did have radio commercials, which Your Honor can listen to, and they do have the super quickly statement at the end. Correct. But isn't that a ubiquitous practice? It's ubiquitous, but— Hold on. The government agencies not only seem to be okay with it, they actually typically require it. Most merchants don't do this for fun. The distinction here is in the main claim. When you hear—when you see terms and conditions, disclosures at the end of a statement, and they're fast, the difference is that the main claim is not as clear and strong as it was in this case. There are business documents from Intuit saying when you say free, that is all people hear. They do not hear anything else. That's the chief growth officer of Intuit, the person responsible for this entire advertising campaign. So when Intuit makes a claim saying you can file for free, foundational principles under the FTC Act says that there have to be disclosures that are strong enough so that that message rings true for all taxpayers, not just the taxpayers for whom—who would qualify. And I wanted to get back to— But is your point, though, that the quick words at the end of a radio ad are insufficient disclosure? It just seems to be in tension with well-established government practice. You have to consider what the main claim is. Each circumstance is different. Here, you had many years of bombarding consumers all across the Internet, free, free, free, free, free. If you make a claim that powerful, you have to qualify it. You have to give consumers the impression— No, no, I understand that. I get all that. My point is if we're going to deem today, as you ask us to, that quick words or small words at the end or at the bottom are not enough, that's fine. I have no problem with that as a citizen. It just seems to be completely contrary to well-established practice of government. We're not establishing a rule that categorically quick disclosures are not enough. This is a case-specific factual finding, which is exactly what the framers of the FTC Act intended and is exactly what the court in Schechter Poultry thought we would do. But we're not going to behave arbitrarily, capriciously. If there's a rule here, and the one that I'm thinking you're wanting is these tiny words aren't enough, quick words at the end of a radio ad aren't enough, then they're not just not enough for Intuit. They're not enough for all industry. I respectfully disagree. Why is this case special? Let's take a hypothetical where the main message in a radio advertisement is just outright fraudulent, right? The advertiser makes a claim that's just fraudulent, and then their disclosures are just quickly, and you can't hear them, and you can't perceive them. The disclosures cannot insulate the advertiser from liability. Respectfully, I do not see how this could be a matter of arbitrary and capricious review when the FTC is applying precedent that has existed for decades. I'm looking at your own brief, which uses the ‑‑ this is not a radio, obviously, but it's an ad on television, I assume. I could see the words just fine. I think that ‑‑ They're small. I'll give you that. The question in this case is not whether some subset of the population could see the ads, especially when your Honor is looking for them as part of this case. The question is whether a substantial minority of reasonable consumers is likely to be misled. And under substantial evidence, this Court can't reweigh the evidence, can't determine whose inferences are stronger. It's whether the commission had a reasonable basis to find how it did. And in this Court's recent decision in impacts, the Court went so far as to say that the level of deference going to factual findings should be no stronger than in a jury trial. And I think that here it's pretty ‑‑ I think it's pretty clear from the face of the ads that in many of these, it would have slipped by. A reasonable consumer is not just a lawyer who's litigating a case based on the briefs. A reasonable consumer includes a single parent who's got three kids who's listening to these ads for 20 seconds while they're trying to cook dinner. Is that in the record, your hypothetical? The specific hypothetical is not. But we do have in the record ‑‑ That's a problem to me. I don't want to prolong this unduly, but I don't see ‑‑ I really have some problems about Professor Novemski's conclusions when he didn't even use consumers who looked at these ads. If I may answer that question, there's a compelling answer to that. In the ideal world for a copy testing, what one would do would be to have a control group and a study group who had no prior exposure to the advertisements, and you would test their response to the stimulus based upon showing them the ads. The problem here is that Novemski, as he explained in his report and as the commission explained in its findings of fact, Novemski could not find a control group in this case because everyone has seen these ads. These ads have had billions of impressions. So what he did was perform a consumer survey analyzing perceptions, asking, do you think you have a simple tax return? And in this case, over 50 percent of ineligible consumers said, yes, I have a simple tax return. The commission didn't rely exclusively on Novemski. The commission also had lay witness testimony from consumers who Intuit chose to depose, showing that they had no earthly idea what simple returns meant. They thought it meant you didn't have complicated investments. They thought it meant that your income was below a certain level. Those do not map on to the definition of simple, and that's why in the commission's remedial order, it requires Intuit to disclose facts, not adverbs, facts that will inform the consumer's decision. Why is the FTC deploying all of them? Never mind. It's not relevant. I just don't understand. May I ask? Yes. So what would have been the solution then is essentially what I'm hearing you saying is one of those fast things at the end of a radio ad. It's simple means X, Y, Z. That's what would cure the problem in your view. No. What would cure it? I'd refer, Your Honor, to the definition of a clear and conspicuous disclosure, which is in the commission's order. It provides detailed guidance that the disclosure has to be perceptible to reasonable consumers. It has to be unavoidable. Let me ask you a question. When I'm on, when I watch TV, I see ads for drugs, for everything that can be imagined. And at the end, there is either language at the bottom, you know, don't use this drug of something, or the advertiser comes on and says, the principal case from the TSTC and the decentralized, I thought this would be, blah, blah, blah. And they read, you know, they've sped up the language so fast. And so I don't understand why this kind of disclosure is incompatible with FTC Act, whereas these drug disclosures. I don't think that those fast drug disclosures that Your Honor is talking about are necessarily lawful. I think there's actually been a marked change in drug advertisements these days where you don't hear them that quickly. When I hear these drug ads, they say, this may cause you cancer and lymphoma, and they're spoken much more slowly than they used to be. And just because there are some ads in the economy that may have a deceptive impression does not mean that the floor should be lowered for everyone. And that's especially true here based upon the nature of the claims in question. It goes back to Intuit's own recognition. When consumers hear the word free in connection with a service, they're unlikely to hear anything else. And that's why the Commission had substantial evidence to find that these ads violated the law, and that Intuit knew it, and its own copy testing showed it, and its own business documents recognized that consumers were being cheated. So with that... Cheated is a strong word here. Intuit's... They're wasting their time. It is more than a waste of time. Oh, come on. If the only thing you could show for harm was some of them took up to one hour. The... Navigating through TurboTax and then finding, oh my gosh, I don't have a simple return, I'm going to have to pay. I'd refer the court to the amicus brief of 22 states where they explain what the harm was in this case. Consumers were diverted from tax-filing products that were actually free for them. Well, I'm sorry, but amicus is, you know, they're not parties and they're not talking... It's also in the record. I don't recall reading that, but I'll take your word for it, other than a few pages that were general about it. There are certain tax-filing programs that are actually free for everyone, and this was the, you know... Well, maybe Intuit should be free for everyone, but anyway. Well, I'd appreciate the chance to supplement with the authorities that we discussed. Well, you may, but the only thing I'll say is you can file the authorities, but I think you've cited most of them in the last five pages of your brief in response to JARCC. There were additional ones referenced here. Okay. Thank you very much, Your Honor. Of course. Mr. Balchuk. Your Honors, I'd like to speak to JARCC briefly and then talk about substantial evidence. There is no case cited in the briefs in this Court holding or rejecting our Article III argument. Mr. Grossman was referring to other cases, Sperry v. Hutchison, Union Bridge. They're not in the briefs. This Court, we obviously respect whatever choice this Court makes about supplemental briefing. We certainly appreciate the opportunity to do the same. Sperry and Hutchison is cited in their brief. I apologize if I didn't see it. There is no case cited in the briefs that rejects our Article III argument, period. If there are others, we'll be happy to discuss them when they bring them forward. Mr. Grossman said that these cases could never, deceptive advertising claims could never have been brought at common law or in equity. Page 31 of our opening brief, we cite not only such cases but also the restatement that says, from the 1930s, the restatement first of torts, that says, a company misrepresenting the ingredients or the quality of its product, which is exactly what's alleged here, was actionable in torts. So these cases absolutely have a common law basis. He also tried to dismiss JARCC as a Seventh Amendment case. As I think Judge Jones was indicating, it is both Article III and Seventh Amendment. Chief Justice Roberts made that perfectly clear because the SEC in that case had argued, even if there is a Seventh Amendment right, there's no violation to hold the cases outside of an Article III court because Article III doesn't require it. If that argument were right, the case would have come out differently, but the court rejected it. Okay. Let's talk, if I can, turn to substantial evidence and talk about— You're talking as fast as some of those are. My apologies, Judge Barksdale. I will endeavor to slow down. But to go to the prominence question, let's talk about the actual evidence in the record because the fact or the supposition that the disclosures were too small, et cetera, is the Commission's say-so, pure and simple. What was the actual evidence? Two things. We asked both of the FTC's fact witnesses. We showed them actual ads. We did better than Nathan Dovensky did with his survey participants. We showed them at trial actual ads. They confirmed that they could see those disclosures and they could hear them. That's Trial Transcript page 247 to 249 for Diana Schiller and 300 to 336 Trial Transcript pages for Megan Bobarek. So that's number one. The Commission says nothing about that in its decision or its brief, and that alone requires reversal when you fail to take account of evidence in the record. Number two, our expert, Peter Golder, did a benchmark survey and compared the disclosures into its ads to those of 18 other industries— excuse me, 18 other companies across four industries using seven metrics drawn from the FTC's own guidelines, prominence, size, repetition, placement, et cetera. And he concluded that Intuit's disclosures were better than or equal to all of the other companies' ads. And all that the FTC in its decision says about that, it says that Professor Golder's analysis is irrelevant to whether consumers understood the disclosures. Understanding is a different point from prominence, okay? I want to talk about understanding, but they have nothing to say about the actual evidence in the record on prominence. And I think, Judge Hoey, you were getting at it, and you're right. If consumers could see and hear the disclosures, and there's no evidence that they couldn't, that alone would preclude a reasonable consumer from jumping to the conclusion that they could necessarily file for free. Now, informativeness or understanding, it doesn't even matter whether reasonable consumers would understand simple returns. Again, just the fact that it said simple returns only would dissuade a reasonable consumer from jumping to the conclusion that they could necessarily file for free because it shows that there are some limitations. But in any event, there is a presumption that reasonable consumers know, number one, that for-profit companies don't give away their products for free to everybody. They can't stay in business doing that. Number two, presumed to be familiar with terms common in the industry like simple returns, used by the IRS, used by the California Franchise Tax Board, used by every major player in the market. But there was actual evidence, even apart from that, that consumers understood simple returns. Rx 304, before this litigation, we tested, and consumers told us that they found the term easy to understand. I want to talk in conclusion about the changing of the simple tax returns definition. Let's get our facts straight. Intuit's definition has been the simplest IRS form that you can use to file your taxes. That is simple returns. For a long time, that was Form 1040EZ. Congress changed the tax laws. The IRS changed the tax forms so that the simplest form was 1040 without any attached schedules. So that became the form to use. It's not a change of the definition of simple tax. It's not a change in Intuit's definition. And as to the fact that it expanded it to unemployment in 2020 and student loan deductions in 2021, Judge Jones, you were exactly right. That was driven by COVID. That was Intuit's effort to do a little bit to alleviate the suffering that people were having during COVID. And the last point I want to make, you also won't see this in the FTC's decision. No good deed goes unpunished. Indeed, Judge Jones, no doubt about it. But one final point on who can file for free. It has always been Intuit's position. Intuit has always allowed active duty and reserve people in the military ranks E1 to E9 to file for free, irrespective of complexity. So even if you have a complex return, this is in the record. There was testimony about this at trial. You file your military W-2, and any charges that would otherwise be imposed are zeroed out. And my last point, Your Honors, is that Mr. Brosman talked about how disclosures can't work if you're using a free, free, free ad. Okay, first of all, that is imposing a new heightened standard for disclosure. They disputed that in their brief, but here he said it again. There is no basis for such a standard in the FTC Act or the FTC's policy statement. And if there were, their own cease and desist order wouldn't solve it. He said once you hear free, free, free, you don't hear anything else. That would include the misleading 37 percent or 33 percent number, whatever it is. They are requiring us to put in ads for the next 20 years. I ask this Court to set aside the cease and desist order and the commission's decision. All right. Thank you, sir. Thank you, Your Honors.